**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| SIGNIFY NORTH AMERICA CORPORATION and SIGNIFY HOLDING B.V., | |
| Plaintiffs, | Civil Action No. 6:22-cv-812-ADA |
| v. | |
| EGLO LEUCHTEN GMBH and EGLO HONG KONG LIGHTING LTD., | JURY TRIAL DEMANDED |
| Defendants. | |

**<u>DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF</u>**

**TABLE OF CONTENTS**

**Page**

I.  LEGAL STANDARDS .................................................................................... 1

    A.  General Principles ................................................................................. 1

    B.  Indefiniteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA) ............... 2

    C.  Means-Plus-Function Under 35 U.S.C. § 112, ¶ 6 (pre-AIA) / § 112(f) (AIA) ..... 2

II.  U.S. PATENT NO. 7,182,480 ("THE '480 PATENT") ................................................. 3

    A.  "a macroscopic optical system … providing a means for creating an
off-axis distribution of the illumination" (Claim 1) .................................... 3

        1.  The lack of any objective boundary of "macroscopic optical system"
renders the phrase indefinite. ........................................................ 4

        2.  If not indefinite, "macroscopic optical system" is a
"means-plus-function" term. ......................................................... 6

    B.  "microscopic optical system" (Claims 1 and 15) ...................................... 9

        1.  The lack of objective criteria for "microscopic optical system"
renders it indefinite. ................................................................... 9

        2.  If not indefinite, "microscopic optical system" is a
"means-plus-function" claim term with insufficiently disclosed
structure ................................................................................ 10

III.  U.S. PATENT NO. 7,737,643 ("THE '643 PATENT") ............................................... 12

    A.  "perceivably white light" (Claim 25) .................................................. 12

IV.  U.S. PATENT NO. 8,070,328 ("THE '328 PATENT") ............................................... 13

    A.  "a second reflector having a first aperture positioned adjacent said
second aperture of said first reflector and a second aperture opposite
said first aperture of said second reflector and defining a light exit
passageway" (Claim 1 and Claim 10) ................................................ 13

    B.  "a diffuser captured between said first reflector and said second reflector"
(Claim 10) ................................................................................ 17

V.  U.S. PATENT NO. 8,348,479 ("THE '479 PATENT") ............................................... 18

4893-5408-9568

A.    "at least two torsion springs located on opposite side surfaces of the downlight module proximal to an open end of the downlight module" (Claim 13) ........................................................................... 18

    1.    The lack of any objective standard of "proximal" renders the term indefinite. .......................................................................... 18

B.    "means for mounting the heat sink and LED package within a recessed light fixture" (Claim 13) ......................................................... 19

VI.    U.S. PATENT NO. 7,543,956 ("THE '956 PATENT") ..................................... 20

A.    "a first module serving as a frame for supporting the plurality of embedded units and the conductive elements in a fixed position during fabrication of the matrix and having features thereon for supporting the plurality of embedded units and the conductive elements" (Claim 1) ..................................... 20

B.    "a second module bonded to the first module and configured to surround the plurality of embedded units and the conductive elements" (Claim 1) ............ 24

C.    "at least one connection mechanism configured to couple to the conductive elements at least one of power and at least one control signal for embedded units" (Claim 1) ................................................................ 25

VII.    U.S. PATENT NO. 8,963,449 ("THE '449 PATENT") ..................................... 27

A.    "to generate a switch control signal using the determined operating parameter to vary an input current to a switching power converter with a phase modulated voltage" (Claims 1, 10, and 24) ........................................ 27

B.    "to generate a switch control signal using the determined operating parameter to control an input current in response to one or more values of the phase delay signal" (Claim 19) .......................................................... 29

4893-5408-9568

## <u>TABLE OF AUTHORITIES</u>

<u>**Page(s)**</u>

<u>**Cases**</u>

*Apple Inc. v. Motorola, Inc.*,
   757 F.3d 1286, 1298 (Fed. Cir. 2014) ........................................................................ 1

*Biosig Instruments, Inc. v. Nautilus, Inc.*,
   783 F.3d 1374 (Fed. Cir. 2015) ........................................................................ 18

*Datamize, LLC v. Plumtree Software, Inc.*,
   417 F.3d 1342 (Fed. Cir. 2005) ........................................................................ 12

*Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*,
   899 F.3d 1291 (Fed. Cir. 2018) ........................................................ 10, 11, 22

*Egenera, Inc. v. Cisco Sys., Inc.*,
   972 F.3d 1367 (Fed. Cir. 2020) ........................................................ 21, 24

*In re Downing*,
   754 F. App'x 988 (Fed. Cir. 2018) ........................................................................ 22

*In re Packard*,
   751 F.3d 1307 (Fed. Cir. 2014) ........................................................................ 22

*Intellectual Ventures I, LLC v. T-Mobile USA, Inc.*,
   902 F.3d 1372 (Fed. Cir. 2018) ........................................................................ 4, 12

*Interval Licensing LLC v. AOL, Inc.*,
   766 F.3d 1364 (Fed. Cir. 2014) ........................................................ 2, 6, 10, 12

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995) ........................................................................ 1

*MBO Labs., Inc. v. Becton, Dickinson & Co.*,
   474 F.3d 1323 (Fed. Cir. 2007) ........................................................................ 1

*Mettler-Toledo, Inc. v. B-Tek Scales, LLC*,
   671 F.3d 1291 (Fed. Cir. 2012) ........................................................................ 8

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
   357 F.3d 1340 (Fed. Cir. 2004) ........................................................................ 1

*Nautilus Inc. v. Biosig Instruments, Inc.*,
   572 U.S. 898, 134 S. Ct. 2120 (2014) ........................................................ *passim*

*Noah Sys., Inc. v. Intuit Inc.*,
   675 F.3d 1302 (Fed. Cir. 2012) ........................................................................ 6

4893-5408-9568

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ................................................................................. 1

*Williamson v. Citrix Online, LLC*,
   792 F.3d 1339 (Fed. Cir. 2015) ......................................................................... *passim*

## **Statutes and Codes**

35 U.S.C. § 102 .............................................................................................................. 23

35 U.S.C. § 112 ......................................................................................................... *passim*

4893-5408-9568

Defendants respectfully submit this opening claim construction brief in support their proposed constructions and indefiniteness positions for the six Patents-in-Suit for which the parties have identified disputed terms and phrases.

## I. LEGAL STANDARDS

### A. General Principles

"The claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). To determine the meaning of the claims, courts start by considering the intrinsic evidence, which includes the claims, specification, and prosecution history. *Id.* at 1313-14.

While the claims "provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must also be considered. *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298, 1314 (Fed. Cir. 2014) *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015). Further, "claims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)).

The prosecution history is another tool for claim construction because the prosecution history provides evidence of how the inventor and the U.S. Patent and Trademark Office ("PTO") understood the patent and whether the inventor limited the invention during prosecution by narrowing the scope of the patent's claims. *Phillips*, 415 F.3d at 1317; *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) ("a patentee's statements during prosecution, whether relied on by the examiner or not, are relevant to claim interpretation"). A patentee may limit the scope of the claims by disclaiming a particular interpretation during prosecution. *Id.*; *see also MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1330 (Fed. Cir. 2007) (prosecution arguments that "draw distinctions between the patented invention and the prior art

1

are useful for determining whether the patentee intended to surrender territory, since they indicate in the inventor's own words what the invention is not").

B.      **Indefiniteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA)**

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention ***with reasonable certainty***." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 134 S. Ct. 2120, 2129 (2014) (emphasis added). If it does not, the claim is invalid as indefinite as a matter of law. *Id.* at 2124.

"It cannot be sufficient that a court can ascribe ***some meaning*** to a patent's claim; the definiteness inquiry trains on the understanding of a skilled artisan at the time of the patent application, not that of a court viewing matters *post hoc*." *Id.* at 2129-30. A patent must be sufficiently precise "to afford clear notice of what is claimed, thereby apprising the public of what is still open to them." *Id.* "The claims, when read in light of the specification and the prosecution history, must provide ***objective boundaries*** for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) (there is an indefiniteness problem if the claim language "might mean several different things and no informed and confident choice is available among the contending definitions").

C.      **Means-Plus-Function Under 35 U.S.C. § 112, ¶ 6 (pre-AIA) / § 112(f) (AIA)**

An element in a claim "may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof." 35 U.S.C. § 112(6). "Generic terms such as 'mechanism,' 'element,' 'device,' and other nonce words that reflect nothing more than verbal constructs may be used in a claim in a manner that is tantamount to using the word 'means' because they typically do not connote sufficiently definite structure and therefore may invoke § 112, para. 6." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1350 (Fed. Cir.

2

2015) (quotation omitted).  If the specification fails to disclose adequate corresponding structure for a means-plus-function term, the term is indefinite. *Id.* at 1351-52.

## II.   U.S. PATENT NO. 7,182,480 ("THE '480 PATENT")

Plaintiffs assert Claims 1-3 and 13-15 of the '480 Patent against Defendants.

### A.   "a macroscopic optical system … providing a means for creating an off-axis distribution of the illumination" (Claim 1)

| Defendants' Construction | Plaintiff's Construction |
|---|---|
| Indefinite. | Plain and ordinary meaning. |
| If not indefinite, means-plus-function term subject to 35 U.S.C. § 112, ¶ 6. | Not indefinite. |
| Function: (1) "enabling redirection of the illumination created by the plurality of light emitting devices" and (2) "providing a means for creating an off-axis distribution of the illuminations." | Signify maintains that this term is not subject to 35 U.S.C. 112 para. 6. Signify also disagrees with the functions identified by Defendants. In particular, the functions identified for "macroscopic optical system" do not account for differences in the claim language between claims 1 and 15. |
| Structure: The position, shape, structure, and material of the (1) reflective optics (e.g., the vertical reflective optics or the horizontal reflective optics), where the reflective optics are fabricated from specular aluminum or a metalized plastic and (2) the position, shape, and material horizontal reflective optics to create an off-axis distribution as described below in the subsequent construction for "means for creating an off-axis distribution of the illumination."<br>"means for creating an off-axis distribution of the illumination." | However, to the extent the Court disagrees, this term is not indefinite and at least the following structures are disclosed: an optical system comprising a reflective optic, which may be planar, slotted, tilted, curved, or parabolic, positioned adjacent one or more light emitting devices, and all equivalent structures. |
| Function: creating an off-axis distribution of the illumination. | Examples of the above-identified structures include those described in the 480 Patent at 6:13-18, 6:25-34, 6:54-61, 7:14-17. |
| Structure: The specific position, shape, structure, and material of horizontal reflective optics 50 in Figure 3, where the horizontal reflective optics 50 includes a slot 60 or the specific structure of horizontal reflective optics 120 in Figures 5 and 6 that are tilted and curved. In addition, a respective horizontal reflective optic for each light emitting device and the horizontal reflective optics are | |

3

| Defendants' Construction | Plaintiff's Construction |
|---|---|
| fabricated from specular aluminum or a metalized plastic. | |

1.  <u>The lack of any objective boundary of "macroscopic optical system" renders the phrase indefinite.</u>

In the context of the '480 Patent, understanding the term "macroscopic optical system" is critical to assessing potential infringement. Patent claims with descriptive words, such as "macroscopic," or terms of degree "must provide objective boundaries for those of skill in the art" in the context of the invention to be definite. *Intellectual Ventures I, LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372, 1375-76, 1381-82 (Fed. Cir. 2018).

The boundaries of the term "macroscopic optical system" in the context of the '480 Patent is fatally unclear. Merriam-Webster defines "macroscopic" as "observable by the naked eye." *Macroscopic Definition & Meaning*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/macroscopic (last visited April. 30, 2023). It is unclear whether the term in this patent refers to the ***optical system*** being observable by the naked eye or the ***redirected illumination*** being observable by the naked eye. *See* Claim 1 ("a macroscopic optical system proximate to the plurality of light emitting devices, said macroscopic optical system enabling redirection of the illumination created by the plurality of light emitting devices"). The specification does not provide any objective criteria to resolve this ambiguity.

Further, the term is used in the claims of the '480 Patent without any language in the claim or specification defining or otherwise indicating its relationship to a related claim term, "microscopic optical system." Merriam-Webster defines "microscopic" as "a. invisible or indistinguishable without the use of a microscope; b: very small or fine or precise" *Microscopic Definition & Meaning*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/microscopic (last visited April. 30, 2023). The specification compounds

the ambiguity inherent in this definition—*i.e.*, how small or fine must the claimed "microscopic optical system" be? The '480 Patent is directed to manipulation of illumination by light emitting devices that are micro-sized in nature. The size of those devices lies right at the boundary between observable and non-observable to the naked eye. But the specification, claims, and prosecution history offer no help in understanding the difference between "macroscopic" and "microscopic."

Further, the specification provides no meaningful guidance to understand how the macroscopic aspect of the optical system contributes to or relates to enabling redirection of the illumination or the means for creating an off-axis distribution of the illumination. In explaining the function of the macroscopic optical system, the specification first recites:

> The ***macroscopic optical system*** provides a means for ***redirecting the illumination*** created by the point source light emitting devices in one or more desired directions. This redirection of the illumination is ***enabled by*** a collection of ***appropriately shaped and positioned reflective optics*** that can preferentially and efficiently redirect light from the light emitting diodes with a greater level of efficiency when compared to the use of moulded refractive optics.

'480 Patent at 5:44-51 (emphasis added). The specification then explains how the horizontal reflective optics, of which the macroscopic optical system is comprised, provides strong off-axis distribution of illumination:

> Having specific regard to FIGS. 5 and 6, the tilted and curved horizontal reflective optics 120 provide strong off-axis distribution of illumination and further producing a narrow beam in the vertical direction.

'480 Patent at 7:1-4 (emphasis added).  As can be seen from the passages above, the '480 Patent does not provide any metes or bounds on what "macroscopic" means in this context or how it relates to the generically described functions.

The specification adds further confusion by suggesting that the reflector optics enable ***preferential*** redirection, but it does not explain how a "macroscopic" characteristic is determined or how it relates to this functionality:

Each embodiment of the macroscopic optical system **comprises a plurality of horizontal reflectors or reflective optics** that enable the **preferential redirection** of illumination into the desired upper portion of the hemispherical luminous intensity distribution of the light emitting devices. In this manner an elevated amount of the illumination provided by the finite number of light emitting devices within the array can be used to create the desired illumination effect.

'480 Patent at 6:1-8 (emphasis added).

In sum, the specification does nothing to explain how the macroscopic function of the system is related to the redirection of the illumination. Thus, the '480 Patent fails to afford reasonably clear notice to the public of the bounds of the term "macroscopic optical system." and, therefore, that term and Claims 1 and 3 are indefinite. *Interval Licensing*, 766 F.3d at 1371; *Nautilus*, 134 S. Ct. at 2130.

2.   If not indefinite, "macroscopic optical system" is a "means-plus-function" term.

Claim 1 recites that "the macroscopic optical system provid[es] a means for creating an off-axis distribution of the illumination." A patentee may express a claim term using functional language. *See* 35 U.S.C. § 112, ¶ 6; *Williamson*, 792 F.3d at 1348. When "means" language is used to describe an element of a patent claim, there is a presumption that this is a "means-plus-function" limitation, and that the construction of the term is governed by 35 U.S.C. § 112, ¶ 6. *Id*. "Generic terms such as 'mechanism,' 'element,' 'device,' and other nonce words that reflect nothing more than verbal constructs may be used in a claim in a manner that is tantamount to using the word 'means' because they typically do not connote sufficiently definite structure and therefore may invoke § 112, para. 6." *Williamson*, 792 F.3d at 1350. These types of terms are "construed to cover the corresponding structure, material, or acts described in the specification." 35 U.S.C. § 112, ¶ 6.

The Court construes a "means-plus-function" claim term in two steps. "The court must first identify the claimed function. Then, the court must determine what structure, if any, disclosed in the specification corresponds to the claimed function." *Williamson*, 792 F.3d at 1351 (quoting

6

*Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1311 (Fed. Cir. 2012)).  If the patent's specification does not disclose adequate corresponding structure, the claim containing the means-plus-function term is indefinite.  *Williamson*, 792 F.3d at 1351.

The "macroscopic optical system" claim term is a nonce term used in the claims for providing the following functions: "redirecting the illumination created by the point source light emitting devices in one or more desired directions," and ""creating an off-axis distribution of the illumination." However, as explained above, "macroscopic optical system" does not connote sufficiently definite structure on its own. After all, the '480 Patent does not describe what "macroscopic" means in this context or how it relates at all to the recited functionalities. Thus, this phrase should be construed under § 112, ¶ 6.

The specification discloses two means for the claimed functionality. First, the '480 Patent discloses the use of reflective optics with a specifically shaped slot in the upper edge position to provide moderate off-axis distribution of illumination, as shown in Figures 3 and 4:

> Having regard to FIGS. 3 and 4, the horizontal reflective optics 50, provide a moderate off-axis distribution of the illumination with a wide beam spread in the vertical direction. The horizontal reflective optics ***include a slot 60 in the upper edge***, wherein this slot allows illumination to propagate unimpeded into the desired upper portion of the hemispherical luminous intensity distribution of the light emitting devices. As illustrated in FIG. 3, there are essentially three forms of light rays, namely an unobstructed ray 70, a reflected ray, 80 and an unobstructed slot ray 90 that together form the illumination that subsequently interacts with the microscopic optic system 100.

'480 Patent at 6:23-34 (emphasis added).

Second, the '480 Patent discloses tilted and curved horizontal reflective optics to provide strong off-axis distribution of illumination, as shown in Figures 5 and 6:

> Having specific regard to FIGS. 5 and 6, ***the tilted and curved horizontal reflective optics 120*** provide strong off-axis distribution of illumination and further producing a narrow beam spread in the vertical direction. Additionally, the curved vertical reflective optics 130 on either side of a particular light emitting device form a trough and provide a narrow horizontal beam spread of the illumination. As an

4893-5408-9568

> example, this form of narrow horizontal beam spread can be useful in wall
> illumination scenarios. As illustrated in FIG. 5, there are essentially two forms of
> light rays, namely an unobstructed ray 70 and a reflected ray, 80 that together form
> the illumination that subsequently interacts with the microscopic optic system 100.

'480 Patent at 7:1-13 (emphasis added).

Therefore, the disclosed structure to which this claim element is limited under § 112, ¶ 6 is reflective optics fabricated from specular aluminum, a metalized plastic, or other form of stiff reflective either with a specifically shaped slot in the upper edge position, as shown in Figures 3 and 4, or tilted and curved horizontal reflective optics, as shown in Figures 5 and 6. Nothing in the specification, the figures, or the prosecution history discloses another manner of redirecting illumination or creating an off-axis distribution of illumination.

Plaintiffs' proposed construction of "plain and ordinary meaning" that is not subject to § 112, ¶ 6 impermissibly expands the scope of Claim 1 beyond the structures disclosed in the patent. Having elected to use means-plus-function language, Plaintiff cannot now capture any undisclosed structure in hopes of covering the accused device. *Mettler-Toledo, Inc. v. B-Tek Scales, LLC*, 671 F.3d 1291, 1296 (Fed. Cir. 2012) ("Although generic A/D converters were known in the art, the patentee chose to use means-plus-function language which limits it to the disclosed embodiments and equivalents."). The Court should adopt Defendants' construction of this means-plus-function claim element.

### B.    "microscopic optical system" (Claims 1 and 15)

| Defendants' Construction | Plaintiffs' Construction |
|---|---|
| Indefinite. <br> If not indefinite, means-plus-function term subject to 35 U.S.C. § 112, ¶ 6 with insufficient structure. <br><br> Function: (1) diffusing the illumination created by the plurality of light emitting devices subsequent to the redirection by the macroscopic optical system, and (2) retain[ing] the off-axis distribution of the illumination; thereby providing a desired level of blending of the predetermined wavelength ranges. <br> Structure: (1) a holographic diffuser with a linear or elliptical distribution, a mechanically-produced plastic diffuser, or a lenticular array. More specifically, Light Shaping Diffuser, Rosco Tough Silk, and Lenticular arrays produced by Fresnel Technologies Inc., respectively; (2) indefinite as no structure described that retains off-axis distribution of the illumination. | Plain and ordinary meaning. <br> Not indefinite. <br><br> Signify maintains that this term is not subject to 35 U.S.C. 112 para. 6. Signify also disagrees with the functions identified by Defendants. In particular, the functions identified for "microscopic optical system" do not account for differences in the claim language between claims 1 and 15. Further, Signify disagrees that "thereby providing a desired level of blending of the predetermined wavelengths ranges" is a claimed function of the "microscopic optical system." However, to the extent the Court disagrees, this term is not indefinite and at least the following structures are disclosed: <br><br> Structure: an optical system comprising one or more of a holographic diffuser, frosted or sandblasted glass, a plastic diffuser, a lenticular array, a lenslet array, or any other form of diffuser having linear or circular distribution characteristics, and all equivalent structures. |

1.    <u>The lack of objective criteria for "microscopic optical system" renders it indefinite.</u>

As with the "macroscopic optical system" term above, the boundaries of the term "microscopic optical system" in the context of the '480 Patent is unclear. The claims and specification provide no objective criteria to indicate the scope of "microscopic optical system." The specification and claims similarly offer no meaningful guidance sufficient to enable those skilled in the art to understand how the microscopic aspect of the optical system contributes to or relates to diffusing illumination or retaining the off-axis distribution of the illumination. In explaining the function of the microscopic optical system, the specification recites:

> Subsequent to interaction with the macroscopic optical system, the illumination is manipulated by a ***microscopic optical system*** that provides for the ***diffusion of the illumination in the desired manner*** while ***retaining control of the desired angular distribution*** created by the macroscopic optical system.

'480 Patent at 7:57-62 (emphasis added). As can be seen from the passage above, the '480 Patent does not provide any metes or bounds on what "microscopic" means in this context or how it relates to the generically described functions.

Thus, the '480 Patent fails to afford reasonably clear notice of the bounds of the term "microscopic optical system" and, therefore, that term and Claims 1 and 3 are indefinite. *Interval Licensing*, 766 F.3d at 1371; *Nautilus*, 134 S. Ct. at 2130.

> 2. <u>If not indefinite, "microscopic optical system" is a "means-plus-function" claim term with insufficiently disclosed structure.</u>

As discussed above, when "means" language is used to describe an element of a patent claim, there is a presumption that this is a "means-plus-function" limitation, and that the construction of the term is governed by § 112, ¶ 6. However, even if the claim language does not include the word "means," a relatively weak rebuttable presumption arises that the function term is not a means-plus-function term. *Williamson*, 792 F.3d at 1349. This presumption against means-plus-function interpretation is rebutted if a challenger demonstrates that the language of the claim fails to "recite sufficiently definite structure" or discloses a "function without reciting sufficient structure for performing that function." *Id.*

The "microscopic optical system" claim term is a nonce term used the claims for the following functions: "(1) diffusing the illumination created by the plurality of light emitting devices subsequent to the redirection by the macroscopic optical system[; and (2)] retain[ing] the off-axis distribution of the illumination; thereby providing a desired level of blending of the predetermined wavelengths ranges." As explained above, this does not connote sufficiently definite structure and therefore this nonce term invokes § 112, ¶ 6.

"Structure disclosed in the specification qualifies as 'corresponding structure' if the intrinsic evidence clearly links or associates that structure to the function recited in the claim."

*Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*, 899 F.3d 1291, 1303 (Fed. Cir. 2018) (quoting

*Williamson*, 792 F.3d at 1352). If those skilled in the art could not both "recognize the structure in

the specification and associate it with the corresponding function in the claim, a means-plus-

function clause is indefinite." *Id*.

The term "microscopic optical system" is indefinite under this standard. The specification

discloses specific **manufacturers** that manufacturer diffusers that could be a "microscopic optical

system":

> For example, the microscopic optical system can be a holographic diffuser with a
> linear or elliptical distribution, a mechanically-produced plastic diffuser, a
> lenticular array or any other form of diffuser having horizontal diffusion
> characteristics as would be readily understood by a worker skilled in the art. As
> examples, a suitable holographic diffuser is called a Light Shaping Diffuser™
> which is produced by **Physical Optics Corporation, Torrance, Calif.**, a suitable
> mechanically-produced plastic diffuser is a Rosco Tough Silk™, produced by
> Rosco Laboratories Inc., Stamford, Conn.), and a suitable lenticular array is
> produced by **Fresnel Technologies Inc., Fort Worth, Tex.** While these are
> examples of suitable microscopic optical systems enabling horizontal diffusion of
> the illumination, a plurality of other devices having similar characteristics to those
> defined would be suitable for integration into the illumination optical system
> according to the present invention.

'480 Patent at 8:7-24 (emphasis added).

Therefore, a "microscopic optical system" is limited to the "Light Shaping Diffuser™"

produced by Physical Optics Corporation, Torrance, Calif.; "Rosco Tough Silk™" produced by

Rosco Laboratories Inc., Stamford, Conn.; and lenticular arrays produced by Fresnel Technologies

Inc., Fort Worth, Tex.  Nothing in the specification, the figures, or the prosecution history discloses

another structure for a "microscopic optical system."

However, the specification completely fails to disclose how these structures, or any other,

"retain the off-axis distribution of the illumination," as claimed.  Therefore, this means-plus-

function clause is indefinite. *Diebold Nixdorf*, 899 at 1303.

### III.   U.S. PATENT NO. 7,737,643 ("THE '643 PATENT")

Plaintiffs assert Claim 25 of the '643 Patent against Defendants.

### A.   "perceivably white light" (Claim 25)

| Defendants' Construction | Plaintiffs' Construction |
|---|---|
| Indefinite. | Plain and ordinary meaning. Not indefinite. |

Subjective terms that depend "on the unpredictable vagaries of any one person's opinion" are often indefinite. *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) (citing *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005), abrogated on other grounds, *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 134 S. Ct. 2120 (2014)). For such terms, it is imperative that some objective standard be provided in the patent to determine the scope of the invention when a claim may result in "different meanings for different users." *See Intellectual Ventures I LLC vs. T-Mobile USA, Inc.*, 902 F.3d 1372, 1381 (Fed. Cir. 2018).

The problem with subjective terms is highlighted in *Intellectual Ventures I*, where the Federal Circuit found the word "optimize" indefinite. There, the Federal Circuit held that whether "quality of service" had been "optimize[d]" was entirely subjective and user-defined because the performance was "defined by . . . what network performance characteristic is most important to a particular user." *Id*. The Federal Circuit found that the "relative term" in the claim resulted in "different meanings for different users," similar to prior holdings regarding other subjective terms such as "aesthetically pleasing." *See id*. (citing *Datamize*, 417 F.3d at 1350-51). The Federal Circuit concluded that "merely understanding that 'optim[izing] ... [quality of service]' relates to the end-user experience 'fails to provide one of ordinary skill in the art with any way to determine whether' [quality of service] has been 'optimiz[ed].'" *Id*.

Like the word "optimize" in *Intellectual Ventures I*, the terms "perceivably" and "white" are indefinite because each requires an inquiry that is fraught with personal opinion and that is entirely user dependent. The specification and claims of the '643 Patent fail to resolve basic questions about the parameters under which "perceivably" and "white" are evaluated, such as:

- Who or what "perceives" the colors?

- Who or what is determining how the colors are "perceive[d]?"

- How is it determined that the light is "perceive[ed]" as white light?

- How is it determined whether different users "perceive" "colors" the same way?

- What are the conditions under which a user or and machine determines "perception" (e.g., viewing conditions or illumination)?

These questions illustrate just some of the complex, subjective considerations that those skilled in the art would have to account for when making color comparisons by eye. The claims and the specification fail to provide any guidance on these questions. Thus, the term "perceivably white light" is indefinite.

### IV.   U.S. PATENT NO. 8,070,328 ("THE '328 PATENT")

Plaintiffs assert Claims 1, 5-7, 9, 10, 14, and 15 of the '328 Patent against Defendants.

**A.**   **"a second reflector having a first aperture positioned adjacent said second aperture of said first reflector and a second aperture opposite said first aperture of said second reflector and defining a light exit passageway" (Claim 1 and Claim 10)**

| Defendants' Construction | Plaintiffs' Construction |
|---|---|
| a frusto-conical shaped or dome shaped component formed of a material and having a surface with diffuse, semi-diffuse, or specular reflective characteristics and that has a primary purpose to reflect light and where that second reflector has an aperture at both ends of the reflector with walls between and with the first aperture of the second reflector being next to a second aperture of the first reflector. | Plain and ordinary meaning. |

Defendant's construction is helpful and should be adopted because the term "reflector" creates ambiguity that should be resolved, and "a first aperture positioned adjacent said second aperture of said first reflector" would benefit from clarification.

The term "reflector" used both for the "first reflector" and the "second reflector" creates ambiguity. The prosecution history is silent with respect to what "reflector" means. The specification states as follows:

> The upper reflector 52 is generally dome shaped including an upper aperture 56 wherein a LED array 80 is positioned. The first reflector 52 also includes a lower aperture 58 defining a lower edge of the reflector 52. The lower aperture 58 is larger than the upper aperture 56 and substantially aligned therewith so that a light exit passageway 90 (FIG. 6) is partially defined.

> According to one embodiment, the first reflector 52 is formed of specular reflective aluminum capable of conducting heat and supporting a lamp. Alternatively, other materials may be utilized having diffuse or specular reflective characteristics. The second reflector 54 may be formed of the same or similar materials as the first reflector 52. The exemplary reflectors 52, 54 may have semi-diffuse reflective surfaces although alternative finishes are contemplated and within the spirit and scope of these teachings.

'328 Patent, 5:7-22. Furthermore, the patent describes that:

> The second reflector 54 is generally frusto-conical in shape and has an upper aperture 60, a lower aperture 62 and a sidewall extending there between. The second reflector 54 may have a sidewall with some curvature or may be substantially straight between the upper aperture 60 and the lower aperture 62. The upper and lower apertures 60, 62 are aligned with the apertures of the first reflector 52 so as to define the light exit passageway 90 generally defined between the upper aperture 56 and lower aperture 62. Thus, when the LED array 80 is positioned above the first reflector 52, the LED light output shines downwardly and out of the reflector assembly 50 through the lower aperture 62.

'328 Patent, 5:23-34.

As such, it is clear from the specification of the '328 Patent that the Applicant intended "reflectors" to encompass downlight fixture assembly components where the purpose of that component is to reflect light rather than downlight fixture assembly components that serve a different purpose and only incidentally reflect light. This evidence also shows that the "second

14

reflector" is a "frusto-conical shaped or dome shaped component formed of a material and having a surface with diffuse, semi-diffuse, or specular reflective characteristics."

Extrinsic evidence supports Defendants' interpretation of "reflector," as a term of art having a specific meaning distinct from other downlight components. For example, *The Lighting Pattern Book for Homes* from the Rensselaer Polytechnic Institute (2007), discusses reflectors and explains the distinction between reflectors and other recessed light components such as baffles or louvers.   Ex. 1 [Defendants'_ExtrinsicEvidenceCC_000001-10], Leslie, Russell P., et al., *The Lighting Pattern Book for Homes,* Rensselaer Polytechnic Institute (2007) at 156-163. Pages 156 and 157 of *The Lighting Pattern Book for Homes* are excerpted below and show the distinction in this field between reflectors, baffles, and louvres, for instance:



**Baffle:** A baffle is a series of light-absorbing ridges that ring the lower inside portion of the luminaire's aperture. The baffle shields the luminaire's brightness from the occupant's normal field of view. Deep or dark-color baffles reduce a luminaire's efficiency.

**Reflector:** The reflector is a component that is optically designed and shaped to maximize the efficiency of the luminaire for a particular type of lamp by directing light out of the luminaire. The reflector typically is made of specular aluminum or white-painted steel. Reflectors are available in several colors, including silver, gold, bronze, and white. Light color reflectors make a luminaire more efficient than dark-color reflectors do. Some recessed luminaires that do not have separate reflector components have reflective surfaces on the interior of the housing. Recessed luminaires that have no reflector at all should incorporate a reflector lamp.

**Lens or diffuser:** Lenses and diffusers are optically designed to create specific light distribution patterns. They are formed from glass or plastics and are positioned in the aperture, or opening, of the luminaire. Several choices may be offered by the manufacturer for each luminaire. The use of a lens reduces a luminaire's efficiency.

**Louver:** A louver is a device that is inserted into a recessed luminaire that does not have a lens or diffuser. The louver shields the lamps in the luminaire from the direct view of the resident. Louvers are made of thin metal or plastic, and consist of vertically oriented parallel strips, hollow cubes, honeycomb, or parabolic shapes.

Luminaires

As can be seen from *The Lighting Pattern Book for Homes,* a recessed light may include a reflector in series with a baffle or a reflector in series with a louver, which are all distinct components. For example, a baffle is a series of light-absorbing ridges that shield the luminaire's brightness from an occupant's normal field of review, while a reflector is a component that is optically designed and shaped to maximize the efficiency of the luminaire.

Furthermore, the claim phrase needs clarification as to how the first and second reflectors are positioned in relation to each other. The reflectors of the '328 Patent are separate, distinct components such that, when assembled, the first aperture of the second reflector is next to or adjacent the second aperture of the first reflector without overlap of the walls of the reflectors, as in Defendants' construction. In addition, the apertures of the reflectors should be clarified as the openings at either end of the reflectors rather than at some undefined distance in the "tunnel" defined by the walls of the reflector. These constructions are illustrated by Figures 1, 3, 6 and 7 and disclosed the corresponding disclosure of the '328 Patent. The Figures and corresponding disclosure do not contemplate any further embodiments that would depart from this construction.

16

The Court should therefore adopt Defendants' construction, and at a minimum, adopt a construction that defines a second reflector to be a downlight fixture component that has a primary purpose to reflect light.

### B.   "a diffuser captured between said first reflector and said second reflector" (Claim 10)

| Defendants' Construction | Plaintiffs' Construction |
|---|---|
| the diffuser is secured between the first reflector and the second reflector when the first reflector and second reflector are connected | Plain and ordinary meaning. |

Defendants' construction is helpful and should be adopted because the term "diffuser captured between" creates ambiguity that should be resolved. The '328 Patent describes "captured between" as an alternative embodiment. Specifically, the detailed description and claims of the '328 Patent describe several different embodiments as to how the diffuser, the first reflector, and the second reflector are positioned in relation to each other.  For example, the '328 Patent states:

> Referring now to FIG. 6, a cross-sectional view of the fixture frame-in kit 10 is depicted. The diffuser 74 is disposed in between the upper and lower reflectors 52, 54. The mounting ring 70 provides a position for the diffuser 74 to be seated. A rivet is shown extending through the mounting ring sidewall 70 and into the diffuse cartridge. It should be understood by one skilled in the art that the modularity of the mounting ring 70 being connected to the lower reflector 54 allow easy replacement for the diffuser, for example if it is damaged during installation or during shipping, by replacement of the lower reflector 54. Alternatively, the mounting ring may be connected to the upper reflector 54 near the lower aperture thereof. <u>In a further alternative, the diffuser 74 may be captured between the upper and lower reflectors when the upper and lower reflectors 52, 54 are connected</u>. In yet a further alternative, the diffuser may be positioned within a one-piece reflector.

'328 Patent at 6:51-67 (emphasis added).

As such, in reciting "a diffuser captured between said first reflector and said second reflector," the Applicant distinguished this embodiment from other embodiments by selecting the "captured between" language for Claim 10. As such, the '328 Patent describes the diffuser as a

4893-5408-9568

standalone component that is secured in the reflector assembly when the upper and lower reflectors are connected together. For at least these reasons, the Court should adopt Defendants' construction.

## V.   U.S. PATENT NO. 8,348,479 ("THE '479 PATENT")

Plaintiffs assert Claims 1, 2, 4, 5, 13, 14, 16, 19 and 20 of the '479 Patent against Defendants.

### A.   "at least two torsion springs located on opposite side surfaces of the downlight module proximal to an open end of the downlight module" (Claim 13)

| Defendants' Construction | Plaintiffs' Construction |
|---|---|
| Indefinite. | Plain and ordinary meaning.<br>Not indefinite. |

### 1.   The lack of any objective standard of "proximal" renders the term indefinite.

The scope of the term "proximal" in the context of the '479 Patent is insolubly unclear. "Proximal" is a term of degree that describes distance between objects. Merriam-Webster defines "proximal" as "situated close to" and "next to or nearest the point of attachment or origin, a central point, or the point of view." *Proximal Definition & Meaning*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/proximal (last visited April. 29, 2023). However, when a term of degree is used in a claim, "the court must determine whether the patent provides some standard for measuring that degree." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015) (quotation marks omitted). The specification and the claims of the '479 Patent do not disclose any point of reference by which those skilled in the art could understand the bounds of "proximal." "Proximal" is not defined or otherwise explained in the specification or elsewhere in the intrinsic record of the '479 Patent.

The specification and intrinsic record also fail to provide objective criteria to understand how "proximal" the torsion springs can be from the open end of the downlight module and still be

"proximal" to the open end of the downlight module. As drafted, there is no guidance that enables those skilled in the art to understand the boundaries of "at least two torsion springs located on opposite side surfaces of the downlight module proximal to an open end of the downlight module." Both Figures 3 and 8 show torsions springs located on opposite side surfaces of the downlight module, but do not provide any meaningful guidance to enable those skilled in the art to understand how close the torsion springs need to be to an open end of the downlight module.

Therefore, the '479 Patent fails to afford reasonably clear notice of the scope of "at least two torsion springs located on opposite side surfaces of the downlight module proximal to an open end of the downlight module" or what is claimed in accordance with the standard imposed by *Nautilus*. 134 S. Ct. at 2130. Therefore, the term "at least two torsion springs located on opposite side surfaces of the downlight module proximal to an open end of the downlight module" is indefinite.

### B. "means for mounting the heat sink and LED package within a recessed light fixture" (Claim 13)

| Defendants' Construction | Plaintiff's Construction |
|---|---|
| Means-plus-function term subject to § 112, ¶ 6. | Plain and ordinary meaning. |
| | Not indefinite. |
| Function: mounting the heat sink and LED package within a recessed light fixture. | Signify maintains that this term is not subject to 35 U.S.C. 112 para. 6. However, to the extent the Court disagrees, the term is not indefinite and at least the following structures are disclosed: torsion springs and all equivalent structures. |
| Structure: at least two torsion springs located on opposite side surfaces of the downlight module proximal to an open end of the downlight module, as in Claim 14. | |

One element of Claim 13 is "means for mounting the heat sink and LED package within a recessed light fixture." As discussed above, when "means" language is used to describe an element of a patent claim, there is a presumption that this is a "means-plus-function" limitation, and that the construction of the term is governed by 35 U.S.C. § 112, ¶ 6. Such claim is "construed to cover

the corresponding structure, material, or acts described in the specification." 35 U.S.C. § 112, ¶ 6.

The only corresponding structure, material, or acts for mounting the heat sink and LED package within a recessed light fixture described in the '479 Patent is "at least two torsion springs located on opposite side surfaces of the downlight module proximal to an open end of the downlight module," as described in Claim 14. The specification is completely silent with respect to any other structure, material, or acts for mounting the head sink and LED package within a recessed light fixture. Therefore, such "means for mounting the heat sink and LED package within a recessed light fixture" claimed in Claim 13 is limited to cover only "at least two torsion springs located on opposite side surfaces of the downlight module proximal to an open end of the downlight module."

## VI.    U.S. PATENT NO. 7,543,956 ("THE '956 PATENT")

Plaintiffs assert Claims 1 and 2 of the '956 Patent against Defendants.

**A.    "a first module serving as a frame for supporting the plurality of embedded units and the conductive elements in a fixed position during fabrication of the matrix and having features thereon for supporting the plurality of embedded units and the conductive elements" (Claim 1)**

| Defendants' Construction | Plaintiffs' Construction |
|---|---|
| An indefinite means-plus-function term.<br><br>Function: supporting the plurality of embedded units and the conductive elements in a fixed position during fabrication of the matrix and having features thereon of the matrix and having features thereon for supporting the plurality of embedded units and the conductive elements.<br><br>Structure: Indefinite. There is no disclosure of the conductive elements or how the module supports conductive elements.<br><br>Alternatively, the structure is: a frame constructed of low temperature wax, Styrofoam, or polymer material. | Plain and ordinary meaning.<br><br>Not indefinite.<br><br>Signify maintains that this term is not subject to 35 U.S.C. 112 para. 6. However, to the extent the Court disagrees, the term is not indefinite and at least the following structures are disclosed for performing the function of "supporting the plurality of embedded units and the conductive elements in a fixed position during fabrication of the matrix": any of frame 306, module 400, or additional material 908a, as described in 2:9-14; 18:53-19:42, and 22:45-64 and/or as illustrated in Figs 3, 4A, 4B and Fig. 9, and all equivalents thereto. |

20

The claim limitations that include the term "first module" are drafted in a purely functional manner and should therefore be treated as means-plus-function claim terms. In view of the specification, there is no structure that could perform the claimed function. The patent, therefore, fails to disclose sufficient corresponding structure. The term "a first module serving as a frame for supporting the plurality of embedded units and the conductive elements in a fixed position during fabrication of the matrix and having features thereon for supporting the plurality of embedded units and the conductive elements" is therefore indefinite.

As discussed above, a patentee may express a claim term using functional language. *See* 35 U.S.C. § 112, ¶6; *Williamson*, 792 at 1348. When "means" language is used to describe an element of a patent claim, there is a presumption that this is a "means-plus-function" limitation, and that the construction of the term is governed by 35 U.S.C. § 112, ¶ 6. *Id.* If the claim language does not include the word "means," a relatively weak rebuttable presumption arises that the function term is not a means-plus-function term. *Williamson*, 792 F.3d at 1349. This presumption against a means-plus-function interpretation is rebutted when a challenger demonstrates that the language of the claim fails to "recite sufficiently definite structure" or discloses a "function without reciting sufficient structure for performing that function." *Id*.

The term "module" is a generic "black box" term that does not recite sufficient structure for performing the claimed functions. *Egenera, Inc. v. Cisco Sys., Inc.*, 972 F.3d 1367, 1374 (Fed. Cir. 2020) ("As used, 'logic' is no more than a "black box recitation of structure' that is simply a generic substitute for "means."). Therefore, the weak presumption against means-plus-function claiming should be set aside. *Id*.

Claim 1 recites "a first module ***serving*** as a frame for ***supporting*** the plurality of embedded units and the conductive elements ***in a fixed position*** during fabrication of the matrix and ***having***

21

***features thereon for supporting*** the plurality of embedded units and the conductive elements." In this claim, the term "first module" is drafted in a functional way, consisting primarily of verb phrases. But "module" does not convey what type of structure would be sufficient to support the plurality of embedded units and the conductive elements. The term "module" adds no structure to the claim and is equally functional as "control module"—the term *Williamson* previously determined to being purely functional. *Williamson*, 792 F.3d at 1349. Therefore, the "first module" term should be construed under § 112, ¶ 6 because it recites "function without reciting sufficient structure for performing that function." *Id*.

"Structure disclosed in the specification qualifies as 'corresponding structure' if the intrinsic evidence clearly links or associates that structure to the function recited in the claim." *Diebold Nixdorf*, 899 at 1303 (quoting *Williamson*, 792 F.3d at 1352). "A claim is indefinite when it contains words or phrases where the meaning is unclear, which may be the result of the lack of an antecedent basis." *In re Downing*, 754 F. App'x 988, 996 (Fed. Cir. 2018) (citing *In re Packard*, 751 F.3d 1307, 1310, 1314 (Fed. Cir. 2014)). "But the lack of an antecedent basis does not render a claim indefinite as long as the claim apprises one of ordinary skill in the art of its scope and, therefore, serves the notice function required by § 112 ¶ 2." *Id*. "Whether th[e] claim, despite lack of explicit antecedent basis for ['first module'] nonetheless has a reasonably ascertainable meaning must be decided in context." *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370 (Fed. Cir. 2006). If those skilled in the art could not both "recognize the structure in the specification and associate it with the corresponding function in the claim, a means-plus-function clause is indefinite." *Diebold Nixdorf*, 899 F.3d at 1303.

Figure 3 shows the "embedded units arranged in a matrix of surface material." The ***only*** mention of any structure, material, or acts in the specification is in one passage of the patent:

As noted previously, when an embedded unit including one or more LED-based light sources is to be integrated with a matrix of surface material, positioning of the embedded unit during the manufacturing of the surface material may be critical. Referring now to FIG. 3, there is shown a schematic illustration of an arrangement 300 of multiple embedded units 100A in a matrix of surface material 302 (i.e., wherein the term "matrix" denotes that the surface material ultimately surrounds the embedded units). The multiple embedded units 100A may be arranged (e.g., positioned, spaced apart) in any of a variety of manners within the arrangement 300. For the embodiment shown in FIG. 3, the surface material may be cast, extruded, and/or molded and arrangement 300 may be positioned within the mold, extrusion and/or casting 304 by means of scaffold or frame 306. Scaffold or frame 306 may be constructed of a ***sacrificial material, e.g., a low temperature wax, Styrofoam, or polymer material***.

'956 Patent at 18:43-59 (emphasis added). This passage says **nothing** about a **structure** for supporting the plurality of embedded units and the conductive elements, but only **exemplary materials** that could be used. And the specification provides no meaningful guidance for how the surviving structure or material for the module relates to the **conductive** feature of the elements.

Furthermore, the prosecution history of the '956 Patent sheds no light on the meaning of the phrase "a first module serving as a frame for supporting the plurality of embedded units and the conductive elements in a fixed position during fabrication of the matrix and having features thereon for supporting the plurality of embedded units and the conductive elements." The Applicant added the phrase "a first module serving as a frame for supporting the plurality of embedded units and the conductive elements in a fixed position during fabrication of the matrix and having features thereon for supporting the plurality of embedded units and the conductive elements" in response to an office action that rejected the claims based on 35 U.S.C. § 102. *See* Ex. 2, Resp. to Office Action Mailed Feb. 10, 2009, filed Feb. 17, 2009. The Applicant provided no reasoning for the addition of the claim phrase, and the claims were subsequently allowed.

Accordingly, the term "a first module serving as a frame for supporting the plurality of embedded units and the conductive elements in a fixed position during fabrication of the matrix and having features thereon for supporting the plurality of embedded units and the conductive

4893-5408-9568

elements" is indefinite because its "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope" of the claims. *Nautilus*, 134 S. Ct. at 2130.

> **B.** **"a second module bonded to the first module and configured to surround the plurality of embedded units and the conductive elements" (Claim 1)**

| Defendants' Construction | Plaintiffs' Construction |
|---|---|
| A means-plus-function term.<br><br>Function: surround[ing] the plurality of embedded units and the conductive elements.<br><br>Structure: any of surface material 302, additional material 406, or material 908, which may or may not be the same material as the first module, as described in 2:9-14, 18:47-19:42, and 22:40-64 and/or as illustrated in Figs. 3, 4A, 4B, and Fig. 9, and all equivalents thereto. | Plain and ordinary meaning.<br><br>Not indefinite.<br><br>Signify maintains that this term is not subject to 35 U.S.C. 112 para. 6. However, to the extent the Court disagrees, the term is not indefinite and at least the following structures are disclosed for performing the function of "surround[ing] the plurality of embedded units and the conductive elements":<br><br>any of surface material 302, additional material 406, or material 908, which may or may not be the same material as the first module, as described in 2:9-14, 18:47-19:42, and 22:40-64 and/or as illustrated in Figs. 3, 4A, 4B, and Fig. 9, and all equivalents thereto |

The parties dispute whether this term should be interpreted under § 112, ¶ 6 in the first place, but do not disagree regarding what the function and structure would be under § 112, ¶ 6. Defendants' position is correct, as discussed above, because the presumption against a means-plus-function interpretation is rebutted when a challenger demonstrates that the language of the claim fails to "recite sufficiently definite structure" or discloses a "function without reciting sufficient structure for performing that function." *Williamson*, 792 F.3d at 1349.

The term "a second module bonded to the first module and configured to surround the plurality of embedded units and the conductive elements" is drafted in a purely functional way, but with no structure that could perform the recited function. Instead, the term "module" is a generic "black box" term that does not recite sufficient structure for performing the claimed functions. *Egenera, Inc. v. Cisco Sys.*, Inc., 972 F.3d 1367, 1374 (Fed. Cir. 2020) ("As used, 'logic'

is no more than a "black box recitation of structure' that is simply a generic substitute for "means."). Reciting a "module" does not convey what type of structure would be sufficient to surround the plurality of embedded units and the conductive elements. The term "module" adds no structure to the claim and is equally functional as "control module"—the term *Williamson* previously determined to being purely functional. *Williamson*, 792 F.3d at 1349. Therefore, the "second module" term should be construed under § 112, ¶ 6 because it recites "function without reciting sufficient structure for performing that function." *Id*.

After all, during prosecution of the '956 Patent, the Applicant added the phrase "a second module bonded to the first module and configured to surround the plurality of embedded units and the conductive elements" in the same response to an office action discussed above for the "first module" term. *See* Ex. 2, Resp. to Office Action Mailed Feb. 10, 2009, filed Feb. 17, 2009. The Applicant provided no reasoning for the addition of the claim phrase, and the claims were subsequently allowed.

Therefore, the weak presumption against a means-plus-function interpretation has been overcome here, and the "second module" term should be construed under § 112, ¶ 6. The parties do not dispute the function or structure that would apply under this interpretation.

C.   **"at least one connection mechanism configured to couple to the conductive elements at least one of power and at least one control signal for embedded units" (Claim 1)**

| Defendants' Construction | Plaintiffs' Construction |
|---|---|
| An indefinite means-plus-function term.<br><br>Function: couple[ing] to the conductive elements at least one of power and at least one control signal for the plurality of embedded units.<br><br>Structure: Indefinite. The patent does not include any disclosure of a "connection mechanism." | Plain and ordinary meaning.<br>Not indefinite. |

The term "at least one connection mechanism configured to couple to the conductive elements at least one of power and at least one control signal for embedded units" is indefinite. The term "connection mechanism" is a functional term that connects the conductive elements. This is a nonce term that should be construed under § 112, ¶ 6. Again, "[g]eneric terms such as 'mechanism,' 'element,' 'device,' and other nonce words that reflect nothing more than verbal constructs may be used in a claim in a manner that is tantamount to using the word 'means' because they typically do not connote sufficiently definite structure and therefore may invoke § 112, para. 6." *Williamson*, 792 F.3d at 1350.

Here, however, the specification discloses no specific structure, material, or acts as to how the connection mechanism performs its function of connecting at least one of power and at least one control signal for embedded units.

Many ***claims*** of the patent disclose elements of the mechanism but do not enable those skilled in the art to understand how such connection mechanism operates. Claim 7 recites "[t]he system of claim 5, wherein the at least one connection mechanism comprises a hollow section of the at least one rail, and wherein an interior profile of the hollow section is fabricated to mate with a connector penetrating the matrix of surface material." Claim 13 recites "The system of claim 1, wherein the at least one connection mechanism comprises at least one conductive feed contacting the conductive elements at a location where the conductive elements are exposed by removal of a portion of the matrix of surface material." Such claims arguably disclose certain characteristics of the connection mechanism, but in no way enable those skilled in the art to understand how such connection mechanism operates. Therefore, the '956 Patent lacks disclosure of such a connection mechanism and does not inform those skilled in the art about the scope of the claim. The term is therefore indefinite.

## VII.    U.S. PATENT NO. 8,963,449 ("THE '449 PATENT")

Plaintiff asserts Claims 1, 10, 19, and 24 of the '449 Patent against Defendants.

### A.    "to generate a switch control signal using the determined operating parameter to vary an input current to a switching power converter with a phase modulated voltage" (Claims 1, 10, and 24)

| Defendant's Construction | Plaintiff's Construction |
|---|---|
| Indefinite | Plain and ordinary meaning. Not indefinite. |

One element of Claims 1 and 24 is "to generate a switch control signal using the determined operating parameter to vary an input current to a switching power converter **with a phase modulated voltage**." Similarly, one element of Claim 10 is "generating a switch control signal using the determined operating parameter to vary an input current to a switching power converter **with a phase modulated voltage**." The claim term is indefinite because there is no indication in the claim, the specification, or the prosecution history as to what constitutes "with a phase modulated voltage" and there is no clear indication what antecedent within the claims "with a phase modulated voltage" is modifying. The core ambiguity stems from the fact that "phase modulated voltage" is not defined and the grammatical construction of the prepositional phrase in which "phase modulated voltage" is included makes it indefinite. This phrase simply leaves the public guessing as to what it means and what it encompasses, rendering it indefinite for lack of reasonable certainty. *See Nautilus*, 134 S. Ct. at 2130.

The term "phase modulated voltage" is not used anywhere in the specification of the '449 Patent except for independent Claims 1, 10, and 24. "Phase modulated" is used in the specification in the context of a "phase modulated signal $V_\Phi$" throughout the specification.  However, Claims 1, 10, and 24 also recite "a phase modulated dimmer signal," which is not used anywhere in the specification of the '449 Patent. In the context of the claims, "phase modulated dimmer signal"

appears to be synonymous with "phase modulated signal" as used in the specification of the '449 Patent.  For example, Claim 1 recites, "an input to receive a phase delay signal indicating a phase delay of a phase modulated dimmer signal."  The specification states that a "light emitting diode (LED) lighting system includes a power factor correction (PFC) controller that determines at least one power factor correction control parameter from *phase delays of a phase modulated signal*." '449 Patent at 6:32-35 (emphasis added).

"Voltage" is used throughout the specification of the '449 Patent to refer to various voltages. For example, "link voltage $V_{C1}$" is generated by the PFC LED driver circuit 304 (e.g., a switching power converter) by boosting the phase modulated signal $V_\Phi$. '449 Patent at 7:19-21. The specification also discloses "a peak voltage $V_{\Phi-pk}$," which is a peak voltage of the phase modulated signal $V_\Phi$ without phase delays. *See id*. at 7:55-57. The PFC switch control signal $CS_1$ could also be a voltage.

As such, "phase modulated voltage" of the claims could be any number of voltages described in the specification or it could be an entirely different voltage.

Thus, the phrase is insolubly ambiguous, and the grammatical construction of the prepositional phrase in which "phase modulated voltage" is included compounds this flaw. For example, the entire claim limitation in Claims 1 and 24 recites, "a signal processor, coupled to the input, to receive the phase delay signal and determine a control operating parameter from the phase delay signal and to generate a switch control signal using the determined operating parameter to vary an input current to a switching power converter with a phase modulated voltage."[1] In the context of the claim as a whole it is impossible to tell what the prepositional phrase "with a phase modulated voltage" is modifying. Is the phase modulated voltage varying the input current? Is the

---

[1] Claim 10 is substantially similar to Claims 1 and 24 but in method form.

input current being varied as the phase modulated voltage is being varied? Is the switch control signal being generated with the phase modulated voltage and using the determined operating parameter? Is the phase modulated voltage the link voltage of the switching power converter?  As such, even if "phase modulated voltage" is referring to the "phase modulated signal," it is impossible to determine the metes and bounds of the claims with respect to "with a phase modulated voltage." The public is simply left guessing as to the meaning of the phrase, which cannot be gleaned with any certainty.

Furthermore, neither the prosecution history of the '449 Patent nor the prosecution histories of the parent patent applications shed any light on the meaning of the phrase "to generate a switch control signal using the determined operating parameter to vary an input current to a switching power converter with a phase modulated voltage." The Applicant added the phrase "to vary an input current to a switching power converter with a phase modulated voltage" in response to an office action that rejected the claims based on double patenting. *See* Ex. 3, Resp. to Office Action Mailed Dec. 13, 2013, filed April 14, 2014. The Applicant provided no reasoning for the addition of the claim phrase and the claims were subsequently allowed.

Accordingly, the term "to generate a switch control signal using the determined operating parameter to vary an input current to a switching power converter with a phase modulated voltage" is indefinite because its "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope" of the claims. *Nautilus*, 134 S. Ct. at 2130.

**B.**    **"to generate a switch control signal using the determined operating parameter to control an input current in response to one or more values of the phase delay signal" (Claim 19)**

| Defendant's Construction | Plaintiff's Construction |
| --- | --- |
| Indefinite | Plain and ordinary meaning. Not indefinite. |

One element of Claim 19 is "to generate a switch control signal using the determined operating parameter to control an input current in response to one or more values of the phase delay signal." The claim term is indefinite because there is no indication in the claim, the specification, or the prosecution history what antecedent "in response to one or more values of the phase delay signal" is modifying. The core ambiguity stems from the grammatical construction of the claims such that it is unclear what is occurring "in response to one or more values of the phase delay signal." This phrase simply leaves the public guessing as to what it means and what it encompasses, rendering it indefinite for lack of reasonable certainty. *See Nautilus*, 134 S. Ct. at 2130.

The claim phrase "one or more values of the phase delay signal" is not used anywhere in the specification of the '449 Patent except for independent Claim 19. The specification describes a digital value of phase delay signal $\Phi$.  Specifically, the specification states:

> Referring to FIGS. 3, 4, and 5, phase delay detector 318 receives phase modulated signal $V_\Phi$ and, in at least one embodiment, determines a digital value of each phase delay $\alpha X$ and $\beta X$ in each cycle of phase modulated signal $V_\Phi$, where X is an index value. To determine the peak voltage $V_{\Phi-pk}$ from the phase delays of phase modulated signal $V_\Phi$, phase delay detector 318 detects the phase delays of each cycle of phase modulated signal $V_\Phi$. In at least one embodiment, phase delay detector 318 generates a digital value of phase delay signal $\Phi$ for each phase delay detected in phase modulated signal $V_\Phi$. Each digital value of phase delay signal $\Phi$ represents a phase delay, and each phase delay indicates a dimming level. For example, a 50 Hz phase modulated signal $V_\Phi$ has a period of 1/50 or 0.02 seconds. A dimming level of 25% is represented by a phase delay of $(0.5 \cdot 0.02) \cdot 0.25$ seconds. Where $(0.5 \cdot 0.02)$ represents the duration of each half cycle of phase modulated signal $V_\Phi$ and 0.25 represents the dimming level. Thus, each phase delay signal $\Phi$ can also be referred to as a dimmer signal.

'449 Patent at 8:30-48.

As such, the specification describes the phase delay signal $\Phi$ as a digital value (e.g., "a digital value of phase delay signal $\Phi$"). However, if the phase delay signal $\Phi$ is a digital value, how can there be one or more values of **the** phase delay signal?

30

Not only is the claim phrase itself ambiguous, the grammatical construction of the disputed phrase compounds this fatal error. For example, the entire claim limitation of Claim 19 recites, "…a controller comprising: an input to receive a phase delay signal indicating a phase delay of a phase modulated dimmer signal; and a signal processor, coupled to the input, to receive the phase delay signal and determine a control operating parameter from the phase delay signal and to generate a switch control signal using the determined operating parameter to control an input current in response to one or more values of the phase delay signal." The claim recites that a control operating parameter is determined from **the phase delay signal** and then generates a switch control signal using the operating parameter to control an input current. the claim ends with "in response to one or more values of the phase delay signal." The claim already states that the control operating parameter is determined from the phase delay signal.  In the context of the claim as a whole and the specification, it is therefore impossible to tell what the claim phrase "in response to one or more values of the phase delay signal" is modifying. As such, what is being performed "in response to one or more values of the phases delay signal?" Is the input current in response to the one or mor values of the phase delay signal? Is the control of the input current in response to one or more values of the phase delay signal? Is the generation of the switch control signal in response to one or more values? Is it the determination of the control operating parameters?

In addition, the claim phrase does not recite how one or more values of the phase delay signal cause a response. Plugging a value (e.g., "1") into the phrase leaves the phrase reciting "in response to 1." Is it the detection of 1 and 3 that causes the response? Is it the receiving of 1 or 3 that cause the response? It is unclear how a value causes a response by itself. As such, it is impossible to determine the metes and bounds of the claims with respect to "with a phase modulated voltage," leaving a person of skill in the art simply left guessing as to the meaning of the phrase.

4893-5408-9568

Furthermore, neither the prosecution history of the '449 Patent nor the prosecution histories of the parent patent applications shed any light on the meaning of the phrase "to generate a switch control signal using the determined operating parameter to control an input current in response to one or more values of the phase delay signal." The Applicant added the Claim 19 when responding to an office action that rejected the claims based on double patenting. *See* Ex. 3, Resp. to Office Action Mailed Dec. 13, 2013, filed April 14, 2014.  The Applicant provided no reasoning for the addition of the claim and the claim was subsequently allowed.

Accordingly, the term "to generate a switch control signal using the determined operating parameter to control an input current in response to one or more values of the phase delay signal" is indefinite because its "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope" of the claims.  *Nautilus*, 134 S. Ct. at 2130.

Dated: May 2, 2023                                      Respectfully submitted,

                                        By:   */s/ Christopher Kao*
                                              Christopher Kao (*admitted*)
                                                christopher.kao@pillsburylaw.com
                                              Pillsbury Winthrop Shaw Pittman LLP
                                              4 Embarcadero Center, 22nd Floor
                                              San Francisco, CA  94111
                                              Telephone:   415.983.1000
                                              Facsimile:    415.983.1200

                                              Steven P. Tepera (TX 24053510)
                                              steven.tepera@pillsburylaw.com
                                              Ben Bernell (TX 24059451
                                              ben.bernell@pillsburylaw.com
                                              Pillsbury Winthrop Shaw Pittman LLP
                                              401 Congress Avenue, Suite 1700
                                              Austin, TX  78701
                                              Telephone: 512-580-9651

                                              *Attorney for Defendants EGLO Leuchten*
                                              *GmbH and EGLO Hong Kong Lighting Ltd.*